OLIVER SCHOOLS, INC., d/b/a The Stratford Schools, Plaintiff,

v.

Cornelius J. FOLEY, Gilbert Harwood, Milton G. Wright. Robert E. Butler and Joseph A. Bradley, Officers, Agents, and Employees of the New York State Higher Education Services Corporation, sued in their individual capacities, Defendants.

No. 91–CV–6479T.

United States District Court, W.D. New York.

Aug. 24, 1994.

Henry E. Wyman, Lee A. Albert, Buffalo, NY, for plaintiff.

Charles D. Steinman, Office of NY State Atty. Gen., Dept. of Law, Rochester, NY, for defendants.

## DECISION AND ORDER

TELESCA, Chief Judge.

### INTRODUCTION

Plaintiff Oliver Schools Inc. ("OSI") seeks summary judgment declaring illegal and unconstitutional the March 17, 1989 decision of the New York State Higher Education Services Corporation ("HESC") which (1) immediately suspended the issuance of Guaranteed Student Loan letters of guarantee to lenders originating loans to OSI students and which (2) initiated administrative proceedings to suspend OSI's eligibility to participate further in federal loan programs administered by HESC. OSI claims that HESC's actions violated 42 U.S.C. §§ 1983 and 1985, the Fourteenth Amendment to the United States Constitution, § 1078(b)(1)(T) of the Federal Higher Education Act and § 680(2) of the New York State Education Law.

Defendants, HESC employees who are sued in their individual capacities, seek summary judgment upholding the legality and constitutionality of their actions or, in the alternative, dismissing OSI's action on qualified immunity grounds.

For the reasons set forth below, OSI's motion for summary judgment is denied and the defendants' motion for summary judgment is granted.[1]

### BACKGROUND

The following facts are undisputed, except where noted. At all times relevant to this action, OSI (also known as the "Stratford Schools") was a New York corporation which operated business schools located in Buffalo, Rochester, Syracuse, and Albany, New York. The majority of OSI's students were economically disadvantaged, and thus the school derived much of its tuition revenue from various grant and loan assistance programs, including the Guaranteed Student Loan ("GSL") program.

The GSL program is a joint federal-state student loan program created pursuant to the Federal Higher Education Act of 1965. The GSL program is comprised of four separate loan programs: the Stafford Loan Program, the PLUS loan program, the Consolidation Loan Program and the Supplemental Loan for Student Program. See 34 C.F.R. § 682.100. In New York, the GSL program is administered by HESC, a state educational corporation within the New York State Education Department. See N.Y. Education Law, Art. 14, § 651, et seq. HESC determines educational institution eligibility for GSL funds, monitors institutional compliance with a myriad of state and federal regulations and administers penalties for institutional violations of pertinent statutes and regulations. Once a school is deemed eligible to participate in the GSL program, its students can apply for low-interest educational loans from private lenders to finance their schooling. HESC guarantees the repayment of these loans and is, in turn, reinsured by the United States Department of Education.

As a school participating in the GSL program, OSI was obligated to make timely refunds of loans in the event that a student receiving GSL funds failed to enroll for classes or withdrew from school before the end of the loan period. OSI could only retain that portion of the loan proceeds needed to cover the student's tuition for the period of time the student attended classes. Pursuant to federal regulations in effect between 1986 and 1988, OSI was required to make loan refunds no later than thirty days after the HESC was notified of a student's withdrawal. 34 C.F.R. § 682.607(c)(1). If, after a student withdrew, OSI failed to refund the loan balance to a lender and the student was not

---

1. Following oral argument on these motions, OSI submitted to this Court supplemental financial information pertaining to OSI for the fiscal year 1993. This information was not requested, was not filed as part of the record in this case and had no part in this Court's decision.

forgiven the refund amount, the student remained liable for the full amount of the loan, plus interest.

In 1986, OSI experienced financial difficulties due to the expected opening and expansion of two campuses, a higher than expected enrollment and changes in state regulations governing the disbursement of student loan proceeds. Appendix to Plaintiff's Summary Judgment Motion at 179 (hereinafter cited as "A.——"). As a result of the financial strain, OSI failed to make timely loan refunds for those GSL students who had withdrawn from OSI. In February 1987, OSI informed HESC of its predicament and asked to discuss "available options and plans" to resolve the refund payment problem. (A.72). At the time, OSI estimated that it owed HESC $214,000 in unpaid refunds. OSI also owed another loan agency, the Higher Education Assistance Foundation ("HEAF"), an additional $200,000 in unpaid refunds. OSI Chairman of the Board, Michael Kelly, told HESC that OSI needed "a few months" before it could begin making refund payments.

In March 1987, Gilbert Harwood, HESC's General Counsel, and Patricia Mullins, HESC Director of Loan Services, met with OSI to discuss the repayment problem. At Harwood's request, OSI provided HESC with information pertaining to its then current financial condition, but stated that a future "cash flow forecast" was unavailable and would be sent to HESC at a later date. (A.75). OSI indicated that regulatory changes in the disbursement of student loan proceeds prevented it from giving HESC a then accurate picture of its cash-flow status.

In April 1987, HESC Manager of the Office of Program Review, Steven Bomeisl, confirmed OSI's indebtedness with HEAF and recommended that a repayment agreement be implemented to remedy OSI's indebtedness to both agencies. Acknowledging that an informal resolution of the repayment problem might not be possible, Bomeisl stated:

> However, Stratford Schools should be advised that their failure to make the scheduled payments to either HEAF or HESC

would lead to an immediate suspension by both agencies.

(A.70).

On May 18, 1987, OSI's Chairman of the Board proposed that OSI settle its liability by making refund payments of $10,000 per month. (A.92). According to HESC, unaudited OSI financial information indicated, however, that OSI's refund liability for fiscal year 1986–87 amounted to $12,500 per month. Based in part on this information, Milton Wright, Vice–President of HESC, wrote OSI and rejected its proposal. (A.98). Instead, HESC demanded that OSI fully repay its outstanding GSL refunds by September 1, 1987 (estimated to be $240,000 including interest and a special allowance) and informed OSI that a failure to do so would likely result in the initiation of limitation, suspension, or termination proceedings against the school. As of June 1987, OSI refund indebtedness to HESC had risen to $341,800.

HESC and OSI officials met again in July 1987, during which OSI stated that it could not commit to full repayment by September 1, 1987. OSI provided HESC with supplemental financial information and a list of paid refunds. (A.114). OSI also proposed that it immediately pay approximately $56,000 in overdue refunds from fiscal 1985–86 and repay all remaining overdue refunds by June 30, 1988. (A.182).

In November 1987, HESC conducted a review of OSI's Albany school to confirm that OSI had paid the refunds as promised (A.37, 242). During this review, HESC discovered that OSI had incurred approximately $15,000 in additional refund indebtedness since June 1987. This development stunned HESC because it understood that OSI would not incur any new refund indebtedness after June 1987. OSI denies that it literally promised HESC it would not incur new debt, stating only "that it would attempt to prevent new refunds from falling into arrears, while working out the terms and schedule for payment of the existing ... arrearage." Plaintiff's Reply to Defendants' Rule 25 Statement of Undisputed Facts ("Plf. Fact Reply") ¶¶ 16–17. Unquestionably, OSI would have to agree that it had committed itself to prevent-

ing further refund liability, whether or not it literally "promised" HESC it would do so.

During the Albany audit, OSI Financial Aid Director Kenneth Clough criticized OSI's management practices and suggested that OSI was financially unstable. Clough stated that he was looking for another job, apparently because he believed that OSI's financial situation was precarious. (A.242).

As of January 1988, OSI owed HESC approximately $225,982 in unpaid refunds. (A.125). In yet another effort to address OSI's predicament, HESC attempted to craft an agreement to bind OSI to a refund repayment schedule. (A.126, 127). In May 1988, defendant Harwood provided Simone Rockwell, Acting President of OSI, with the agreement, which included a provision requiring OSI to hire an independent certified accountant and to pay all overdue refunds within six months of their identification by the accountant. (A.128). Harwood again warned OSI that a failure to accept the agreement would likely result in the commencement of suspension, limitation, or termination procedures against it:

> Note however, that if you fail or refuse to execute or comply with the Agreement, the Corporation will be forced to resort to its legal remedies, including action to suspend, limit or terminate Oliver School's further participation in NYSHESC's financial aid programs.

*Id.* OSI responded with several proposed amendments to the agreement, and significantly, refused to hire an accountant. HESC found this response unacceptable and chose not to reply to OSI's counterproposal.

In July 1988, Rockwell informed HESC that OSI had not paid refunds due as of March 1988. Rockwell stated that approximately $66,000 in overdue refunds from September and October 1987 had not been paid, but that checks for that amount had been sent to lenders. HESC asked for, but never received, satisfactory confirmation from OSI that the $66,000 was in fact paid.

Despite attempts by OSI to pay off its liability during 1988, defendant Bradley states that in January 1989 Rockwell informed him that OSI had fallen behind badly

in the last six months and that it had cash flow problems. According to Bradley, Rockwell stated that she was unaware of OSI's then current refund repayment status. Bradley's recollection of this discussion is documented in a memorandum prepared on the same day he spoke with Rockwell. (A.111). Nevertheless, OSI claims that Rockwell never made these statements, Plf. Fact Reply ¶ 21, and attempts to refute Bradley's version of events through an affidavit prepared by Rockwell in 1990 for use in OSI's then-pending summary judgment proceedings before Judge McAvoy in the Northern District of New York. *See* A.221–23. Not only does Rockwell's affidavit completely fail to challenge Bradley's recollection, it lacks trustworthiness because it was prepared expressly *for litigation over one year after the conversation took place.* This Court finds that there is no *genuine* issue of material fact as to the specifics of the conversation between defendant Bradley and Simone Rockwell, and adopts Bradley's version of events for purposes of this decision.

Based on information provided by OSI, between 1985 and April 1988, OSI had incurred refund debt of approximately $954,-450, of which $703,965 was paid, leaving $250,485 still outstanding. (A.111). Alarmed by OSI's persistent refund liability problem, HESC directed that a program review be conducted of OSI's Rochester and Buffalo campuses. A random sampling of students attending the Buffalo school revealed that 100 percent of the refunds due to students who had withdrawn were paid between two to twenty-six months late, and that 18 percent of those refunds had not been paid at all. (A.3). Similarly, a review of the Rochester campus found that 100 percent of the refunds due were between two to seventeen months late, and that 68 percent of them had not been paid at all as of the review date. (A.13).

In a March 17, 1989 letter, Foley notified OSI that HESC was taking emergency action, pursuant to 8 N.Y.C.R.R. § 2004.5(c), denying any further loan guarantees to lenders making loans to OSI students. Furthermore, HESC informed OSI that, pursuant to 8 N.Y.C.R.R. § 2004.5(a) and (b), it intended

to suspend OSI's eligibility to participate in the GSL program, as well as the other guaranteed student loan programs administered by it, effective April 15, 1989. As the chief basis for its actions, HESC cited "the failure of [OSI] to make timely refunds to students and/or lenders [pursuant to federal and state regulations] and to make reimbursement of the interest and special allowance that accrued as a result." Foley also informed OSI that it could provide him with written materials relevant to the late refund issue, and that OSI could request a meeting to discuss HESC's decision.

HESC did not publicly announce its action. However, pursuant to federal regulations, it informed the United States Department of Education ("DoE") of its actions against OSI. DoE, in turn, notified OSI that it remained eligible to participate in federal loan programs but would no longer receive loan funds in advance. Instead, OSI would be reimbursed for loans made to students from its own revenues. Concerned about the immediate loss of revenues from HESC's and DoE's actions, OSI requested a meeting with HESC to discuss whether the emergency action could be suspended pending the negotiation of another repayment agreement.

On March 28, 1989, OSI's attorney, Henry Wyman, met with HESC officials and proposed (orally and in writing) that HESC immediately lift its suspension, in return for which OSI would begin to make refund repayments in the third quarter of 1989, and repay the total amount by December 31, 1989. (A.22). When pressed by HESC officials, Wyman estimated that OSI's unpaid refunds had risen to approximately $740,000, not including interest and special allow-

ances.[2] Several weeks later, in an attempt to convince HESC to rescind its decision, OSI submitted additional financial information pertaining to HESC. (A.27). HESC rejected Wyman's proposal, demanding prompt payment of the total amount of outstanding debt. No agreement was reached, and on April 17, 1989, OSI closed all of its schools in New York State.

### PLAINTIFF'S CLAIMS

OSI brings this action against five HESC employees individually, who served in the following capacities during the events at issue: Cornelius Foley, the President of HESC; Milton G. Wright, Vice–President of HESC; Gilbert Harwood, HESC's General Counsel; Robert E. Butler, the Assistant Vice–President for the Guaranteed Student Loan Division of HESC; and Joseph A. Bradley, the Manager of the Office of Program Review in the Guaranteed Student Loan Division.[3]

OSI claims that defendants' violated 42 U.S.C. §§ 1983 and 1985, through their failure to provide OSI with a "trial-type" hearing before suspending OSI's receipt of loan guarantees and initiating suspension proceedings against it. (Counts I and II). OSI also claims that the defendants' actions damaged its business reputation and good standing in the community, thereby implicating a Constitutionally protected liberty interest. (Count III). Finally, OSI alleges that defendants' actions violated the Federal Higher Education Act, 20 U.S.C. § 1078(b)(1)(T) and § 680(2) of the New York Education Law. (Counts IV and V).

**2.** OSI disputes the accuracy of Wyman's estimate of its indebtedness, calling it "speculative" and "unsupported by any financial data or reports concerning OSI." Complaint ¶¶ 82, 83. Significantly, OSI does not dispute that HESC was entitled to rely on an estimate of refund indebtedness given by OSI's *legal counsel* at such a pivotal moment in the parties' discussions. It is at least inconsistent for OSI to attempt to downplay the seriousness of their refund liability problem in March 1989 by now attempting to disclaim Wyman's statements. The record reflects that between 1987 and 1989, OSI's refund liability rose from approximately $240,000 to $740,000. This Court finds that Wyman's statements

to HESC are undisputed material facts for purposes of this motion.

**3.** OSI previously brought an identical complaint against HESC and defendants in their official capacities in the Northern District of New York. That complaint was dismissed by Judge McAvoy on Eleventh Amendment grounds. 1990 WL 152048, 1990 U.S.Dist. LEXIS 13150 (October 2, 1990). The Second Circuit affirmed and granted OSI leave to amend its complaint to sue defendants in their individual capacities. *Oliver Schools Inc. v. Foley*, 930 F.2d 248 (2d Cir.1991).

## DISCUSSION

### I. *Plaintiff's § 1983 Claim*

■ 42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

OSI claims that the individual defendants have violated its civil rights under § 1983 by depriving it of protected property and liberty interests without due process of law.[4] However, the doctrine of qualified immunity shields governmental employees from suit for damages arising from alleged civil rights violations:

provided [that] his or her 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'

*Natale v. Town of Ridgefield*, 927 F.2d 101, 104 (2d Cir.1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

■ Government officials sued in their individual capacities are immune from suit where (1) it was unclear at the time the official acted that the plaintiff's interests were protected by a federal statute or the Constitution; (2) it was unclear at the time of the acts that an exception did not permit the acts; or (3) that it was objectively reasonable for the official to believe that he was not violating the plaintiff's protected rights. *Robison v. Via*, 821 F.2d 913 (2d Cir.1987). The inquiry is not whether plaintiff has alleged a violation of law, but whether under

the particular circumstances, defendants could have reasonably believed they did not violate plaintiff's statutory or constitutional rights. *Gittens v. Lefevre*, 891 F.2d 38 (2d Cir.1989).

HESC pursued two distinct courses of action against OSI: (1) it immediately stopped issuing loan guarantees to lenders making loans to OSI students, pursuant to its emergency powers under 8 N.Y.C.R.R. § 2004.5(c); and (2) it informed OSI that, pursuant to 8 N.Y.C.R.R. § 2004.5(a) and (b), it intended to suspend OSI's eligibility to participate in all GSL programs administered by HESC effective April 15, 1989 and continuing until completion of the suspension proceedings.

■ As discussed below, regardless of whether OSI had a property interest in its continued eligibility and participation in the GSL program, it is clear that HESC afforded OSI ample pre-deprivation process prior to invoking its emergency action or initiating suspension proceedings against OSI. It is equally clear that defendants, to the extent they were responsible for doing so,[5] provided OSI with notice and an opportunity to be heard. Defendants, therefore, are immune from suit.

### 1. *Existence of a Property Interest*

OSI claims that it has a Constitutionally protected property interest in its continued participation and eligibility in the GSL program, which prevents HESC from disturbing those rights in the absence of notice and an opportunity to be heard.

■ Whether a property interest is created in continued participation and eligibility in a student loan program depends on whether that right is created "by existing rules or understandings that stem from an independent source such as state law...." *Board of*

---

**4.** OSI's liberty interest claim is addressed in Part III, *infra.*

**5.** According to the New York Education Law and documentation in the record, Cornelius Foley, the President of HESC, was solely responsible for taking emergency action and initiating suspension proceedings against OSI. *See* 8 N.Y.C.R.R. § 2004.5. This Court notes in pass-

ing that the decision-making authority of the remaining defendants, and therefore their potential liability under § 1983, is questionable. For example, OSI apparently does not dispute that defendant Bradley's "responsibilities for and authority in compliance matters were limited and modest." Plf. Fact Reply ¶ 28.

*Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Several provisions of the New York State Education Law and regulations provide that an institution's participation in student award and loan programs cannot be suspended, limited or terminated without giving an institution notice and an opportunity to be heard. *See, e.g.,* N.Y. Education Law § 665(3)(c)(ii), § 665–a(1), § 680(2); 8 N.Y.C.R.R. § 2004.5. The explicit inclusion of provisions requiring notice and an opportunity to be heard support the conclusion that the state has created a protected property interest in continued participation and eligibility in these programs. *See Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 175 (2d Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 581–82 (2d Cir.1989); *see also Continental Training Services, Inc. v. Cavazos,* 893 F.2d 877 (7th Cir.1990) (property interest exists in eligibility to participate in student loan program).

However, this Court need not definitively decide whether OSI has a protected property interest in its continued eligibility to participate in the GSL program or in a lender's receipt of GSL guarantees, because as discussed below, OSI received all of the process it was due prior to HESC's emergency action and the initiation of suspension proceedings.

### 2. *Notice*

After almost two full years of negotiation over OSI's refund indebtedness, HESC suspended the provision of future loan guarantees to lenders making loans to OSI students and initiated suspension proceedings against OSI. HESC's actions were set forth in a March 17, 1989 letter from HESC President Cornelius Foley to OSI's Acting President Simone Rockwell.

There can be little question that OSI had ample notice that it was in serious trouble and was facing the imposition of sanctions, including suspension, limitation or termination from the GSL program. Beginning in February 1987 when OSI notified HESC that it was significantly behind in making its refund payments, OSI knew that it was violating federal and state regulations requiring timely payment of said refunds, *see* 34 C.F.R. § 682.607(c); 8 N.Y.C.R.R. § 2105.2, and was thus in jeopardy of losing its GSL eligibility. Over the subsequent two year period, a significant number of meetings, letter contacts, and phone conversations took place between the parties, all with the goal of reaching an agreement for full repayment of OSI's outstanding refund liability. During the same time, OSI repeatedly acknowledged its noncompliance with federal and state regulations requiring that eligible institutions make timely loan refund payments.

More importantly, HESC twice placed OSI on specific written notice that it was in danger of losing its GSL eligibility. In a July 9, 1987 letter rejecting OSI's proposal for repayment, HESC Vice–President Milton Wright stated, "As I have informed you, the only acceptable response would be repayment in full of $240,000 [principle plus interest and special allowances] by September 1, 1987." (A.98). He proceeded to give plaintiff an explicit warning:

> Unless arrangements satisfactory to us are effected within the next week providing for repayment by September 1, 1987, of the $240,000 admittedly due for non-refunded loans ... the school will be referred to our Counsel's office for appropriate limitation, suspension, and termination proceedings.

During similar repayment negotiations on May 3, 1988, HESC again specifically placed OSI on written notice of a potential suspension in its eligibility:

> Note however, that if you fail or refuse to execute or comply with the Agreement, the Corporation will be forced to resort to its legal remedies, including action to suspend, limit, or terminate [OSI's] further participation in [HESC's] financial aid programs.

(A.128). The language of this letter and OSI's lengthy tenure in the GSL program suggests that it was aware of the potential for emergency action in addition to the initiation of suspension proceedings. This Court finds that OSI had ample notice that HESC might invoke regulatory sanctions to address the persistent refund problem.

### 3. *Opportunity to be Heard*

The record further indicates that defendants provided OSI with an "opportunity to show cause," as required by state regulations. 8 N.Y.C.R.R. § 2004.5(b)(1). Over a two year period prior to the proposed suspension, OSI repeatedly acknowledged its non-compliance, while the defendants gave OSI opportunities, of which it took advantage, to present materials in its defense. As OSI concedes, HESC officials and OSI "over a two year period talked about, wrote about, met about and received documents about the dimensions, causes, and *potential cures* for OSI's late refund problem." Affidavit of Michael Kelly ¶ 15 (emphasis added). As OSI concedes:

> From April through August 1987 there were many proposals going back and forth between OSI and the Defendants ... Making proposals and counter proposals was a hallmark of the informal compliance process between OSI and the Defendants in 1987 and 1988.

Plf. Fact Reply ¶ 13.

Moreover, at the time HESC invoked its emergency action and initiated suspension proceedings against OSI, it informed OSI of its right to submit written material and to request an informal meeting to show cause why such action should not be taken:

> Please be advised also that written materials relating to the timely payment of refunds, compliance with your obligations relating to refunds, and any other information pertinent to the refund violation issue or the period of suspension of eligibility may be submitted for the undersigned's consideration. You may also request a meeting on such matters ... The undersigned will consider any timely material presented in writing and any material presented during the course of a timely requested meeting, including any showing that you have adequately corrected the violations which have led to the initiation of the suspension proceedings. After considering such material, the undersigned will provide you with notice of the action being taken.

(A.20, 21).

After receiving this notice, HESC and OSI engaged in meetings and telephone conversations explicitly aimed at coming to a resolution of OSI's unpaid refund problem. The record makes clear that OSI was eager to remedy the refund problem and that HESC was equally eager to assist OSI as much as possible. However, HESC was not required to wait indefinitely for OSI to propose a workable solution. Nor was HESC willing to indefinitely postpone action because a suspension might exacerbate OSI's "cash flow" problem. Indeed, OSI's cash flow problem became HESC's paramount concern because it became evident that OSI was using refund monies for deficit spending. Only after it became clear that OSI's indebtedness was increasing with no solution in sight and that the State and OSI students faced imminent financial harm, did HESC take emergency action and propose OSI's suspension from the GSL program.

Under circumstances virtually identical to those in this case, the Second Circuit has held that an educational institution which engaged in informal pre-deprivation discussions with the State received ample opportunity to be heard prior to HESC's final decision to demand a refund of Tuition Assistance Program ("TAP") overpayments. *Interboro Institute, Inc. v. Foley,* 985 F.2d 90 (2d Cir.1993). In *Interboro,* the New York Education Department discovered that Interboro, a junior college, had received TAP funds for students who did not satisfy the State's loan eligibility requirements. The State Comptroller prepared an audit of Interboro and forwarded the draft results to HESC. In response, HESC informed Interboro that it would have to refund the TAP awards paid to the unqualified students. *Id.* at 92. On no less than five occasions during the Comptroller's audit process (and before a final audit report was prepared) Interboro submitted written comments on the audit report, all of which were considered by the Comptroller. Interboro ultimately requested an evidentiary hearing on the refund issue. HESC rejected Interboro's request, informed it that all hearing requests must be made to the Department of Education and threatened to withhold future TAP payments

if Interboro did not immediately remit the amount due.

Interboro commenced an action pursuant to 42 U.S.C. § 1983, claiming that it was entitled to an evidentiary hearing before the State took final action against it. 985 F.2d at 93. The district court denied Interboro's request for a hearing and that holding was affirmed by the Second Circuit. Finding its prior decision in *Oberlander v. Perales*, 740 F.2d 116 (2d Cir.1984), dispositive, the Court held that Interboro had been given ample opportunity to be heard during the Comptroller's audit process. The Court specifically noted that Interboro had submitted comments "at every level of the OSC audit and HESC review" and that OSC and HESC had responded to those comments. *Id.*

The *Interboro* court rejected the argument that a pre-deprivation evidentiary hearing was necessary before HESC could withhold TAP payments. As the Court explained:

> The purpose of a pre-deprivation hearing is to ensure that decision-makers have before them the claimant's legal arguments and do not act on a one-sided or otherwise incomplete factual presentation.

985 F.2d at 93. Interboro's submissions to OSC and HESC during the OSC audit process were more than adequate to satisfy due process requirements. In light of Interboro's exhaustive submissions to the relevant decision-makers before HESC's action, the Court noted that a pre-deprivation evidentiary hearing would have not affected the outcome and might have impeded the State's regulatory obligations:

> To require an evidentiary hearing that would be entirely duplicative and essentially meaningless would impair [the regulatory agencies'] review procedures.

*Id.* at 94.

The Second Circuit's analysis in *Interboro* controls here. Over a two-year period, OSI was given, and took advantage of, unlimited opportunities to correct its refund deficiencies and argue against the imposition of regulatory sanctions. At every juncture, OSI

was cognizant of the fact that HESC would take action if the refund violations were not cured. OSI claims that it was not given a meaningful opportunity to rebut HESC's findings that emergency action was justified, *i.e.*, that an unreasonable risk of loss of funds to the State or students existed and that the risk outweighed the importance of first initiating a suspension proceeding. *See* § 2004.5(c). However, OSI's claim is belied by the two-year course of events which preceded HESC's actions. HESC's decision was based on well-documented and articulable proof that OSI's refund indebtedness was increasing and that, therefore, OSI students were at risk of incurring unforeseen loan obligations. OSI's position is also inconsistent with argument to this Court that:

> Not once during this period did the Defendants state or imply an ultimatum to OSI. They never suggested that a proposal of theirs was final and binding or that counter proposals were unacceptable and unwelcome and would be met with limitation, termination or suspension proceedings. Such rigidity and authoritative imperiousness was entirely alien to the give and take of the protracted and flexible discussions and exchanges.

Plf. Fact Reply ¶ 14.

Clearly, a full blown pre-deprivation evidentiary hearing would not have provided OSI with a more meaningful opportunity to be heard. *See Continental*, 893 F.2d at 894 (four written and two oral submissions to agency before revocation of eligibility in federal loan programs satisfies due process). Moreover, OSI could have requested an evidentiary hearing on HESC's emergency action through an Article 78 proceeding, which, for some inexplicable reason, it chose not to pursue. *See Interboro*, 985 F.2d at 94.[6]

On this basis, OSI's claim that it was unconstitutionally denied a pre-deprivation hearing is meritless and must be dismissed as a matter of law.

---

6. Contrary to OSI's claim, an Article 78 proceeding would have been available because HESC's decision to invoke emergency action was final

once it rejected OSI's request for a reprieve pending the completion of suspension proceedings. *See* 8 N.Y.C.R.R. § 2004.5(c).

## II. *Plaintiff's § 1985 Claim*

 Plaintiff also claims that defendants' allegedly unconstitutional actions justify an award of damages under 42 U.S.C. § 1985. In order to succeed on the merits of this claim, OSI must allege and prove (1) a conspiracy; (2) for the purpose of directly or indirectly depriving a person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) whereby a person is injured in his person or property or is deprived of any right or privilege of a United States citizen. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Furthermore, OSI must allege and prove that "some racial, or perhaps otherwise class based, invidiously discriminatory animus [lay] behind the conspirators' actions." *Id.* at 102, 91 S.Ct. at 1798; *Bray v. Alexandria Women's Health Clinic*, ─── U.S. ───, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

 OSI's § 1985 claim must be dismissed. During this proceeding, OSI has repeatedly suggested that defendants invoked regulatory sanctions knowing that such action would drive OSI out of business. *See, e.g.,* Affidavit of Lee Albert ¶¶ 32–37, 75. The factual record supports no other possible motive for HESC's alleged discrimination. However, § 1985 was not enacted to address conspiracies motivated by economic or commercial animus. On this basis alone, OSI's § 1985 claim is meritless and must be dismissed.

 Even if OSI could allege and prove a non-economic motive for defendants' alleged discriminatory conduct, its § 1985 claim must be dismissed because it has failed to demonstrate its membership in a protected class. It is beyond peradventure that § 1985 was enacted to protect those groups historically subject to discrimination. Assuming that OSI's "class" is defined as educational institutions declared eligible to participate in the GSL program, that most definitely is *not* a class subject to heightened Constitutional scrutiny. *See National Communication Systems, Inc. v. Michigan Public Service Commission*, 789 F.2d 370, 374 (6th Cir.), *cert. denied*, 479 U.S. 852, 107

S.Ct. 182, 93 L.Ed.2d 117 (1986) (telephone companies which are the object of an alleged conspiracy to drive them out of business cannot sue under § 1985(3) because they "are not members of a discrete and insular minority of the sort that has traditionally received special protection under the suspect classification analysis of the fourteenth amendment").

## III. *Plaintiff's Liberty Interest Claim*

 OSI claims that defendants' actions infringed on its protected liberty interest in "its good standing and reputation in the community." Complaint ¶ 137. Specifically, OSI claims that defendants' notification to DoE "severely limit[ed] plaintiff's available funding sources for federal financial aid." *Id.* ¶ 138. It also claims that defendants publicized their actions to unnamed individuals, the general public and the media. *Id.* ¶ 139.

 It is well established that an alleged injury to reputation alone is insufficient to implicate a liberty interest under the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In *Paul*, the Supreme Court held that a liberty interest could be implicated where damage to reputation was suffered *in conjunction with* the loss of a constitutionally or statutorily protected right. This "stigma-plus" formulation is adhered to in this Circuit. *See White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062–63 (2d Cir.), *cert. denied* ─── U.S. ───, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). In addition to establishing the existence of a liberty interest, OSI must also prove that HESC's actions were stigmatizing, false and publicized by defendants. *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir.1991).

 As a threshold matter, there is no proof in the record to support OSI's allegations that defendants publicized HESC's actions to individuals, the general public and the media. *See* Affidavit of Joseph A. Bradley ¶ 9; *White Plains Towing*, 991 F.2d at 1063 ("there appears to be no evidence that defendants made the critical statement to the public in general, or to any member of the public in particular, or to any person inquir-

ing as to plaintiffs' [business] operation.")[7] The record demonstrates that, as required by federal statute and regulations, defendant Joseph Bradley, the then Manager of GSL Program Review, notified the United States Department of Education ("DoE") of HESC's actions. *See* Exhibit B to the Affidavit of Joseph Bradley. There is no proof that information pertaining to HESC's actions was disseminated by an HESC employee other than in this one instance. *See* Complaint ¶ 91–95. It is clear, therefore, that OSI's liberty interest claims against the defendants other than Bradley are meritless and must be dismissed.

With respect to defendant Bradley's action, it is equally clear that he was legally obligated to inform DoE of HESC's actions and that the information disseminated to DoE (consisting of a cover letter and a copy of HESC's March 17, 1989 suspension letter) was factually accurate. Indeed, OSI does not dispute the correctness of the information given to DoE. The record also lacks any allegation or proof that OSI was deprived of a protected property interest by virtue of HESC's notification to DoE. After receiving HESC's notification, DoE wrote OSI and informed it that it remained eligible to receive federal loan funds, but that it would have to forward funds to students and then seek reimbursement from the Government:

> Under the reimbursement system, your institution may continue to obligate funds for the Federal student financial assistance programs under Title IV of the Higher Education Act of 1965, as amended.

(A.169). OSI continued eligibility to participate in the federal loan program is fatal to its claim that a protected interest was infringed by defendant Bradley's notification to DoE. OSI's liberty interest claim must be dismissed as a matter of law.

## IV. Plaintiff's New York Education Law and Federal Higher Education Act Claims

OSI also claims that defendants' actions violated New York Education Law § 680(2) and the Federal Higher Education Act, 20 U.S.C. § 1078(b)(1)(T), in that OSI was denied an on-the-record hearing before HESC's emergency action revoking OSI's GSL guarantees.

### A. New York Education Law

New York Education Law § 680(2) grants HESC the authority to promulgate rules and regulations governing the application, granting, payment and repayment of loans made by HESC. In addition, § 680(2) provides that:

> [HESC] shall adopt rules and regulations governing the participation of a college or vocational institution in the programs established by this part, *including procedures for the limitation, suspension or termination of such participation after notice and opportunity for a hearing,* due to the violation or failure to carry out any rule or regulation prescribed by [HESC].

This provision was originally promulgated by the New York Legislature in 1974 as part of the Higher Education Act which created HESC and defined its powers. There appears to be no legislative history defining the term "hearing" as it is used in this provision. However, HESC regulations provide notice and an opportunity to show cause prior to a decision to suspend an institution's eligibility. *See* 8 N.Y.C.R.R. § 2004.5(b).

▮▮ Surprisingly, OSI interprets § 680(2) as requiring an on-the-record adversarial hearing before HESC can take *any* action against an institution, including emergency action. This Court disagrees with OSI's overbroad and strained reading of this provision. First, § 680(2) expressly and unambiguously addresses due process require-

---

7. Additionally, the fact that the individual defendants might have spoken with each other about the possibility of emergency action or the initiation of suspension proceedings does not implicate a protected liberty interest. *See White Plains Towing,* 991 F.2d at 1063; *Brandt v. Board of Cooperative Educational Services, Third Supervisory District, Suffolk County, New York,*

820 F.2d 41, 43 (2d Cir.1987) (a liberty interest is implicated where "the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities.")

ments before *suspension, limitation or termination* proceedings, not emergency action. Therefore, § 680 does not mandate a hearing before emergency action is invoked.

■ Even if § 680(2) does apply to the instant situation, due process jurisprudence teaches that it is the *nature* of the opportunity to be heard, not the *form* of that opportunity, which is paramount. In cases such as this, the overriding consideration is whether the aggrieved party has had a *meaningful* opportunity to present argument on its behalf. As discussed above, there is no doubt that OSI took every opportunity to argue its case in the two years after HESC became aware of the refund problem and that OSI considered its discussions with HESC "meaningful". OSI's claim that it was given inadequate opportunity to be heard is unsubstantiated. HESC had every right to take action against OSI sooner, but chose to give OSI *two years* of opportunities to remedy its financial situation. OSI simply could not meet that challenge.

### B. *Federal Higher Education Act*

■ Section 1078(b)(1)(T) of the Federal Higher Education Act provides, in pertinent part, that state actors, such as HESC:

> [provide] no restrictions with respect to eligible institutions (other than nonresidential correspondence schools) which are more onerous than eligibility requirements for institutions under the Federal student loan insurance program as in effect on January 1, 1985.

This provision applies to *eligibility* requirements for institutions and does not pertain to the enforcement of those requirements. Therefore, this provision is irrelevant to a determination of whether OSI was provided with sufficient notice and opportunity to be heard prior to defendants' actions. There is no merit to OSI's argument that HESC's emergency action or the initiation of suspension proceedings was prohibited under federal law. *See* Defendants' Summary Judgment Memorandum 31–32.

### CONCLUSION

OSI received all of the process it was due: for over two years, OSI and HESC held meetings, corresponded and had telephone conversations regarding OSI's refund indebtedness. Given that OSI's indebtedness rose from $240,000 to $740,000 during the course of these discussions, HESC demonstrated remarkable restraint and forbearance in not taking action against OSI sooner than it did.

WHEREFORE, OSI's motion for summary judgment is denied and the defendants' motion for summary judgment is granted. OSI's complaint is hereby dismissed.

ALL OF THE ABOVE IS SO ORDERED.